This case involves several Bakley-Booker issues and also an Apprendi issue. This case involves several sentencing enhancements under the federal sentencing guidelines. Also there was an enhancement under 18 U.S.C. 2326 in which the district court increased the penalty for the mail fraud offense, for telemarketing conduct, either under 2326-1 or 2326-2. And if you're going to do that, pardon? Clearly not two. It was two involves the same thing. It was two involves the same thing, and the court said that's not improved. Right. Well, either the court made a mis-the records are a little unclear. Either the court made a mistake later and then enhanced the sentence based on 2622 after they had dismissed it, or it was based on 2326-1, which was not even alleged in the indictment. Therefore, it was an Apprendi violation. Well, the indictment, I thought, didn't say one or two. It just said 2326. Well, the allegations in the indictment basically talked about elderly victims, 55 and over. It also talked about telemarketing and their cumulatives. So if you take off the elderly victims, why aren't you left with the telemarketing? Well, it's the Appellant's position that really the allegations were, you know, in regards to 2623, 262, and 1 really wasn't mentioned in the indictment. Therefore, you know, it's a ---- They just mentioned? I mean, you just went over this. I mean, I don't understand. As Judge Berzon points out, the indictment only deals with a section, 2326. It doesn't deal with subsections, right? And it talks both about telemarketing, which is in subsection 1, and the elderly, which is in subsection 2. So it charged both things. It charged the full section, which contains both subsections. And at some point, the district judge said, look, you've proven telemarketing. You haven't proven elderliness. So he drops out the elderliness aspect of it. So he drops everything contained in 2326-2, as having not been established. Fine. So that still leaves you with telemarketing enhancement. I understand. It's just... I mean, I understand you say this is your position is different, but that's of little interest that your position is different. How are you going to persuade us to have our position be different? Well, basically, I believe that the indictment is not very clear. Just by saying it was just 2326, not really specifying, you know, which one, and then talking about 2 rather than 1. So I believe it was not, you know, clearly stated in the indictment. But beyond that, this case really should be remanded under Ameline because of all of the sentencing enhancements under the federal sentencing guidelines. And I think... You're asking for an Ameline remand? Yes, Your Honor. I think that can be arranged. Which kind of Ameline remand are you asking for? You're asking the sentence be vacated? Are you asking we send it back and ask the judge whether he or she would have opposed a different sentence if it had known it was not mandatory? Well, obviously, the plaintiff, the appellant would like their sentence vacated. But a limited remand would be better than no remand. Did you preserve, I think what underlies Judge Reinhart's question is, did you preserve Brucker-era sufficiently in the district court? You raised apprentice questions, right? Yes. Well, obviously, you know, Brucker wasn't mentioned because Brucker wasn't decided. But did you adequately preserve for harmless error as opposed to plain error purposes the Sixth Amendment problem that underlies Brucker? Well, I believe that, yes, because there was an objection made by the defendant under Apprendi grounds. The defendant said that the amount of loss should be under a reasonable doubt standard under Apprendi and also that the other enhancements should be under a clear and convincing evidence standard. So it's the appellant's position that that would, you know, preserve the issue. But, you know, even if it's under a plain error review, it still should be remanded because there's really no way to say how the district court would have decided if it knew that the guidelines were advisory because the district court mentioned the fact that this was a very hefty sentence under the guidelines, one of the heaviest sentences that it had imposed for this kind of conduct. There was a real problem with the amount of loss, you know, and the, you know, loss calculation. And I'm just wondering, you know, is there any point in our trying to deal with your challenges to that at this point, or does it make more sense simply to remand the whole thing? Well, I believe that this case should be remanded and the sentence should be vacated. Thank you. Thank you. And I preserve any further time. May it please the Court. My name is Ellen Lindsey. I'm an assistant U.S. attorney in Los Angeles. And I was trial counsel, and I am not going to stand here and argue that you shouldn't remand pursuant to M-line. I thought I had the world's greatest argument since he sentenced the defendant to the mid-range, but that was the case in M-line 3 as well. So I think we're prepared for the M-line remand. I would like to argue to the Court, though, that it should be the limited remand just to ask Judge Tabrisian if he would have sentenced the same way had he known that the guidelines were not mandatory, to do the remand procedure that's set forth in M-line 3 rather than a full remand. I think even if it is harmless error, even if it was properly preserved, that the question is still the same and the error is still the same, and that is, would you – he applied the sentence – the sentencing guidelines as mandatory as opposed to advisory. So the error is still the same. And would it have been the same had those guidelines been advisory as opposed to mandatory? I don't think it's necessary. Kagan. My understanding is that the case law – I'm not sure there's a Ninth Circuit case yet on harmless error as opposed to plain error, but the case law elsewhere is quite plain that a full remand and vacating occurs if there was a challenge on Apprendi-related grounds originally. Do you agree that there was such a challenge originally? Well, obviously, it wasn't raised perfectly because nobody knew. I was pretty impressed that he managed to raise it to the extent that he did. So I think that there was – And pretty good lawyers. Every party did, I thought. Well, not whoever did the indictment. I didn't hear that one. Not whoever wrote the indictment. Oh, I wrote the indictment, Your Honor. Oh, you did? Yes, I wrote the indictment. All by the elderly, isn't it? Everything's a scheme to defer the elderly. Your Honor, I have to say that Judge Teruzi had made his ruling, but I thought he was nuts. Personally, not that that will affect you, Your Honor, but there was very, very strong evidence that, in fact, he did target the elderly. Every single insider testified that the people were elderly, that they were confused, that they didn't know what was going on, that they were scared by the computer aspects of it. Well, maybe Judge Teruzi, in being over 55, is elderly and has a problem. Yeah, the over 55 thing is – that's real popular with juries, I'll tell you that much. But the problem is sort of classifying as over 55 as elderly. That's where I have a problem. Really, you should see the jurors' faces when we present them with that. It's the – yeah. And the judges. So clearly, Judge Teruzi had a problem with that. But I think that – Well, what about the variance problem? I'm not sure I quite have a handle on this. But let's suppose that they had this indictment, and the elderly thing is not irrelevant, as in some cases. I mean, it's certainly relevant to whether there's 10 years or 5 years or whether there's an enhancement or isn't an enhancement. Suppose they said to themselves, we're going to defend on the ground that they weren't elderly, and therefore – because that's what's been – the basis for claiming an enhancement is that they're elderly. So we're going to prove that they weren't elderly. And therefore, we're not going to have a 2326 enhancement. And then what happens is he says, well, you're right. They're not elderly, but that isn't good enough. We're still going to allow the government to go ahead on the other enhancement, not the elderly one. Just the telemarketing. Right, just the telemarketing. If you had alleged 2326-2, you'd have a problem. Is that right? What if you had alleged 2326-2? Without 2326-1? Yes. What if you had alleged just 2326-2? Well, only to the extent that the court sentenced to 10 years. Right. Without a current. Right. I mean, the fact is that under the Guidelines, if you're using the Guidelines, then you need to put the counts consecutive to the extent that you need to fulfill the Guidelines sentence. So you're saying the enhancement wouldn't have mattered? The statutory enhancement didn't really matter because the Guidelines would have come out the same way? Well, because he settled on the Guidelines of 120 months, and then he sentenced concurrent on all counts, and then, of course, on the 1302 counts or just 2-year counts. But everything was concurrent. He made everything concurrent. And if one had been knocked out, 2326-1, as well as 2326-2, then he could have and should have, pursuant to the way the Guidelines are written, run the counts consecutive, and you would have the 10 years. It's not the way he did it, in fact. No. No, he didn't. Because he was very clear that he was still finding 2326-1. And I think the way that the indictment is written does allow you to take out that aspect of the elderly and still have the element of telemarketing. So, Eileen, do you agree that if we're going to remand it, we should just remand everything and we should not undertake at this juncture to review the largest of the issues raised, which is with regard to the amount of loss? No. I think that this Court should consider that, because even if there is a remand, the judge is most likely going to calculate loss the same way he did before. Is Ted Kavisium retired yet? No, Your Honor. But it's going to happen. Is there a date? Not that I know. I know he's really excited about it. No. And I hope that he — Well, he's pretty elderly to continue. I didn't write the statute, Your Honor. So, I mean, it is our position, it is the office position that it should be a limited amyline remand. There's another aspect that I should bring up, and that is that I'm not sure that really want there to be a full reconsideration, because there was one particular consideration regarding loss that is not — the situation has changed. And that is that we were very careful to preserve Alabama, the Alabama case's integrity. And part of that was to take out the chunk of loss that they were dealing with, so that they could have their own case and not worry about a sentence that would, through fairness, maybe have to run concurrent. Well, they made it concurrent anyway. So I think I would argue to the district court that that $8.6 million should no longer be subtracted from the amount of loss. So I think a full remand in this case could result in a higher sentence, because the loss wouldn't — we wouldn't necessarily — That could be true of any kind of a remand. I mean, a full remand or a non-full remand. I'm sorry, Your Honor? That could be true of any kind of a remand. I don't think so, because if it was just a limited amyline 3 remand, then the question would simply be to Judge Tavrisian, would you have sentenced the same had you known that the guidelines were — Rather than now, that's the difference. Well, it's up to the defendant to take that risk. You've certainly put them on notice. Yes. And they don't have to ask us to reverse the sentence if they don't want. And we might even say that they, once we reverse, they still have the option of not going to ask for a new sentence. But it's really their decision. If you're saying maybe they'll end up with a higher sentence, that sometimes happens on a — when you get a sentence vacated. Yes. And each time you get it vacated, you end up with more time sometimes. That's correct. And I think that that actually — They certainly are aware of that, because you've said it here. That's right, Your Honor. I wanted to make that clear. One question about the loss calculation. I was a little confused about, I mean, what companies were involved in the loss calculation. There were a bunch of companies that he owned or controlled. There were others, as I understand it, for which his company made telephone calls which he didn't own or control. Is that right? Or was he sort of a middle person? Well, yes. Yes. That was — the two companies really that we're talking about are Farpoint Services and Garrison. Right. Garrison was a substantive company that he owned and controlled. It was his product that he was selling. Farpoint, he owned and controlled. And what Farpoint did was supply the scripts to the telemarketers who were selling their own product and then provide the credit card processing for these companies. And you included both — or the judge included both in the estimate of the loss. Is that right? Yes. So what evidence is there in the record that the fraudulent scheme proven was primarily with respect to the product company? I disagree with that. That's an allegation that the defendant makes. And Judge Tavresian did find that the entire operation was permeated by fraud, that all of these credit card companies were selling the same thing, which was this credit card protection that was illusory and fraudulent in the way it was sold. Whether it was Garrison's — All of these companies were selling credit card protection? Yes, with the exception of a small amount of lottery sales. But the great majority, the vast majority, as the defense investigator testified, were these credit card protection sales. And the defendant supplied the scripts, whether it was on his own product, Garrison, or the other people's product. He insisted on supplying the scripts to the telemarketers. I could be wrong about this, but I thought that he didn't actually do the telemarketing for the other products. Rather, he did the credit card processing, and that included some of these confirming scripts but not the original sales. Is that not right? He didn't — no, he didn't on any of them, even his own product. He farmed out to telemarketing companies the sale of his own product. Okay. And then telemarketing companies were also selling their own product. But the defendant supplied scripts for the — sorry, scripts for all of the sales, whether it be his own product or the other products. And then he did the verification procedure that was a fraudulent procedure in and of itself. And the scripts were rife, even as the defendant admitted in his testimony. All of these scripts were rife with these misrepresentations. He did the verification. They also did some degree of fulfillment, which means that they would actually — his company would actually send out packages of information for the companies, not his own credit card protection company, but the other companies that he was processing for would send out fulfillment. They would send out products. And then they also, of course, processed through the bank, and they provided the customer service for all of these companies. In other words, when people had complaints, they would call the defendant's company, as opposed to the company actually selling the product. So the defendant was kind of the centralized person for the processing of the sales and the interacting with the customers once the product had been sold. And then Judge DeBresian did find that all of it was fraudulent, not just Garrison, his own product. Okay? Okay? Thank you, counsel. Thank you very much. If you'd like. Well, first of all, of course, I want to clarify that a defendant would, like a full remand and a sentence vacated, and that it's the defendant's position that the Blakely error was preserved. And if the court is considering the amount of loss, then I'd like to say a few words about it. What we're dealing with are verification tapes that the defendant submitted for totally other reasons, in which there were calls of telemarketers recorded. But it was not established at all whether all of these calls had to do with the particular companies that were in the indictment. In fact, there was a small percentage of the calls, about 38% of the calls had to do with companies that were named in the indictment. And if we're just talking about Garrison, that was only, you know, very small, you know, a few number of calls that were Garrison calls. It was also established. I thought that his, he had, one of his companies was the company that did the calls and it was named in the indictment, right? Fairpoint or something like that? No. I mean, some of the calls were attributed to, you know, the various entities named in the indictment. But the majority of the calls were completely different companies with completely different names, and that's in the appendix of the opening brief. And also there was testimony that the defendant acted as an intermediary between the telemarketing firms and the banks. And so it was not established whether these calls had to do with, you know, completely unrelated matters, that these calls were not just the telemarketers' calls, which the defendant wanted to monitor for some reason or other, but it was just not established that these calls actually had to do with the company's name in the indictment. So therefore, this amount of loss, you know, was completely speculative. Do you know why this case was expedited? Well, because the defendant wanted to be transferred to Canada and he needed to have his, have everything resolved before he can request a transfer. Okay. Thank you. I have nothing further. Thank you. The case is here. It will be submitted. The Court will stand in recess.
judges: Reinhardt, Kozinski, Berzon